# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| SHELLEY L. VANSICKLE, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Case No. CIV-10-054-SPS |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of the Social | ) |
| Security Administration, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

The claimant Shelley L. Vansickle requests judicial review pursuant to 42 U.S.C. § 405(g) of the decision of the Commissioner of the Social Security Administration denying his application for benefits under the Social Security Act. The claimant appeals the decision of the Commissioner and asserts that the Administrative Law Judge ("ALJ") erred in determining that she was not disabled. As discussed below, the Commissioner's decision is REVERSED and the case is REMANDED to the ALJ for further proceedings.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id.* § 423 (d)(2)(A). Social security regulations

implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[1]

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997) [citation omitted]. The term substantial evidence has been interpreted by the United States Supreme Court to require "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). The Court may not reweigh the evidence nor substitute its discretion for that of the agency. *Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991). Nevertheless, the Court must review the record as a

---

[1] Step one requires the claimant to establish that she is not engaged in substantial gainful activity, as defined by 20 C.F.R. §§ 404.1510, 416.910. Step two requires the claimant to establish that she has a medically severe impairment (or combination of impairments) that significantly limits her ability to do basic work activities. *Id*. §§ 404.1521, 416.921. If the claimant is engaged in substantial gainful activity, or if her impairment is not medically severe, disability benefits are denied. At step three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. pt. 404, subpt. P, app. 1. If the claimant suffers from a listed impairment (or impairments "medically equivalent" to one), she is found to be disabled without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must establish that she lacks the residual functional capacity (RFC) to return to her past relevant work. The burden then shifts to the Commissioner to establish at step five that there is work existing in significant numbers in the national economy that the claimant can perform, taking into account her age, education, work experience and RFC. Disability benefits are denied if the Commissioner shows that the claimant's impairment does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

whole, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Casias*, 933 F.2d at 800-01.

## Claimant's Background

The claimant was born on May 29, 1972, and was thirty-seven years old at the time of the administrative hearing. She has degrees in psychology and sociology from Southeastern Oklahoma State University and past relevant work as a mental retardation aide, fast food worker, teacher's aide, and caseworker (Tr. 18, 25-26). The claimant alleges she has been unable to work since July 15, 2005, because of depression disorder, anxiety, post-traumatic stress disorder, chronic malfunction of the kidney, pain in kidney and pelvis area, and numbness in the left leg (Tr. 142).

## Procedural History

On September 14, 2007, the claimant applied for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income payments under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-85. Her applications were denied. ALJ Michael Kirkpatrick conducted an administrative hearing and determined the claimant was not disabled in a decision dated October 6, 2009. The Appeals Council denied review, so the ALJ's decision represents the Commissioner's final decision for purposes of this appeal. *See* 20 C.F.R. §§ 404.981, 416.1481.

**Decision of the Administrative Law Judge**

The ALJ made his decision at step five of the sequential evaluation. He found that the claimant had severe impairments (uretral reflux, obesity, depression, anxiety, and post-traumatic stress disorder) but retained the retained the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), *i. e.*, she could lift/carry/push/pull ten pounds frequently and twenty pounds occasionally, stand/walk/sit for six hours in an eight-hour workday, but perform only simple, unskilled tasks with routine supervision which do not require interaction with the general public (Tr. 14). The ALJ concluded that although the claimant could not return to her past relevant work, she was nevertheless not disabled because there was other work she could perform in the national economy, *i. e.*, housekeeping cleaner, bakery racker (food production industry), and hand bender or bagger. (Tr. 18-19).

**Review**

The claimant contends that the ALJ erred in his finding that she could interact with supervisors and co-workers on a limited basis and have limited contact with the public. As part of this argument, the claimant argues that the ALJ failed to properly analyze her credibility. The Court agrees, and the decision of the Commissioner must be reversed.

In December 2002, the claimant underwent a hysterectomy during which the distal left ureter was inadvertently clipped or caught with a suture. As a result, the claimant was forced to endure a left ureteroneocystostomy on April 1, 2003, followed by several

subsequent procedures, in order to repair the damage (Tr. 336). Following this procedure, the claimant was admitted to the Medical Center of Southeastern Oklahoma on August 20, 2003 because of complaints of low back pain that progressively worsened and was exacerbated with urination to the point that claimant felt like she was going to pass out (Tr. 213). The claimant was noted to be experiencing left uretral reflux before and after voiding by the University of Oklahoma Medical Center in August 2004 (Tr. 343). On May 18, 2005, Dr. Victoria Pardue of Choctaw Memorial Hospital noted that claimant "had been admitted to the hospital on numerous occasions with urinary tract infections" (Tr. 234). The claimant was hospitalized again for two days on November 14, 2005 because of hematuria, intractable nausea, and a urinary tract infection (Tr. 248). She was hospitalized yet again from March 27, 2006 through March 31, 2006 for urinary tract infection, hematuria, cardiac dysrhythmia, nausea, and anxiety and she was noted to be in "excruciating pain" (Tr. 264). There are numerous notations in the medical evidence regarding complaints of flank pain (370, 371, 377, 382, 398, 452, 454, 464, 465, 470, 530) and recurring urinary tract infections (Tr. 452, 465, 485, 486, 580, 581).

In November 2006, the claimant began receiving mental health treatment at Carl Albert Community Mental Health Center (Tr. 655). The diagnostic impression at that time was post-traumatic stress disorder, which resulted from her botched hysterectomy (Tr. 654). She reported frequent nightmares, symptoms of depression for at least three years, racing thoughts, and difficulty dealing with stress and anxiety (Tr. 647). During a visit to her therapist in February 2007, the claimant reported daily pain ranging from 7 to

10 on a ten-point scale, daily crying spells, and difficulty remembering things and concentrating (Tr. 636). The claimant reported in December 2006 that her "daily pain makes it hard to go around others . . . [and] she has some days she just stays in bed and cries due to pain and other days just stays in bed because she is so depressed" (Tr. 624). In October 2007, the claimant reported that her anxiety level was high due to health problems and her impending visit with a kidney specialist (Tr. 599). On June 6, 2008, the claimant presented at a counseling session exhibiting a flat affect and sad mood and was in tears for most of the session (Tr. 705), but two weeks later reported having more good days than bad days (Tr. 704). The claimant was prescribed Paxil, Trazadone, and Xanax to deal with her mental health-related symptoms (Tr. 707).

On November 6, 2007, state reviewing physician Dr. Sally Varghese, M.D. completed a Psychiatric Review Technique (PRT). Dr. Varghese found that claimant suffered from: (i) depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, sleep disturbance, decreased energy, and difficulty concentrating or thinking; and (ii) post-traumatic stress disorder (Tr. 665-67). Dr. Varghese further found that claimant had moderate limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace (Tr. 672). Finally, Dr. Varghese determined that claimant was markedly limited in her ability to understand and remember detailed instructions, ability to carry out detailed instructions, and ability to interact with the general public (Tr. 676-77).

Dr. Shafeek Sanbar, M.D. also reviewed claimant's medical records and completed a Physical Residual Functional Capacity Assessment form on November 8, 2007 (Tr. 680-87). Dr. Sanbar found that claimant had the physical capacity to occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand and/or walk and sit for 6 hours in an 8-hour work day (Tr. 681).

The claimant testified at the administrative hearing that she experiences ureter reflux on a daily basis that causes her to occasionally pass out due to pain (Tr. 29-30). She stated that when she has an episode, it will usually last for around two hours during which time she will "try to find a comfortable position to stay and not move around too much" in case she passes out (Tr. 30). The claimant takes Lortab for pain, which helps only when the pain is not excessive (Tr. 30-31). The claimant testified that she has chronic urinary tract infections which make her nauseous and for which she is constantly on antibiotics (Tr. 32). The claimant stated that she only sees her physician "about every six months" because she does not have insurance (Tr. 32). The claimant testified that following her hysterectomy, she worked for Kiamichi Council but was let go due to excessive medical absences (Tr. 34). The claimant testified that she takes Minipress to deal with frequent nightmares, Vistaril to help her sleep, Effexor for depression, Buspar for anxiety, and Xanax for stress (Tr. 35). Even with the medications that she is taking, the claimant testified that she only sleeps about two hours at a time and that there are days that she goes without sleeping at all (Tr. 36-37). The claimant testified that she is only able to stand up for about 15-30 minutes because of pressure that builds up in her

kidney, sit up for about 15-30 minutes because of numbness that develops in her left side (resulting from the nephrostomy tubes that were placed in her left kidney), and that she was limited to lifting no more than five pounds by Dr. Williams of OU Medical (Tr. 39). She stated that if she does too much cleaning, then she "down for about seven to ten days where [she's] just in pain" (Tr. 41). The claimant obtained a $150,000 settlement for a medical malpractice lawsuit against her doctor related to the botched hysterectomy, which she used to buy a house and pay off her car (Tr. 43).

The claimant contends that the ALJ erred, *inter alia*, by failing to properly analyze her credibility. Deference must be given to an ALJ's credibility determination unless he misreads the medical evidence taken as a whole. *Casias v. Secretary of Health & Human Services,* 933 F.2d 799, 801 (10th Cir. 1991). And he ALJ may disregard subjective complaints of pain if unsupported by any clinical findings. *Frey v. Bowen,* 816 F.2d 508, 515 (10th Cir. 1987). But credibility findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) [quotation omitted]. A credibility analysis "must contain 'specific reasons' for a credibility finding; the ALJ may not simply 'recite the factors that are described in the regulations.'" *Hardman v. Barnhart*, 362 F.3d 676, 678 (10th Cir. 2004), *quoting* Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4.

The first problem with the credibility analysis here is that it contains language suggesting that the ALJ judged the credibility of the claimant's testimony by comparing it to an already-determined RFC: "[T]he claimant's statements at her hearing concerning

-8-

the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment" (Tr. 15). If the ALJ did in fact judge the claimant's credibility by its consistency with the RFC, this would clearly be error; the ALJ must *first* evaluate the claimant's testimony (along with all the other evidence) and *then* formulate an appropriate RFC, not the other way around. The Commissioner has lately employed such language in a number of opinions, and the Court finds it troublesome even where the ALJ discusses evidence appropriately bearing on the claimant's credibility.

Compounding the error here is that the ALJ apparently discredited the claimant's testimony based on a series of speculative statements that are not supported by the record. For instance, the ALJ faulted the claimant for how she spent some settlement money and inferred she was not as limited as she claimed because she did not "use some of the windfall for appointments with her treating physician" (Tr. 16). The ALJ also supported his credibility findings by speculating that the claimant's pain was not as debilitating as she claimed because she was not referred to a free clinic as she was for hypertension (Tr. 16). Finally, the ALJ found the claimant was not credible because "[i]t seems unlikely that claimant's treating physicians or her family would allow her to live by herself while faced with a daily occurrence of passing out from pain" (Tr. 16). None of these inferences are in any way supported by the record; in fact, the assertion that the claimant lives alone is actually *contradicted* by the record, as she actually lives with her teenage son (Tr. 41). Furthermore, the ALJ stated that the "[c]laimant was fired for excessive

absences . . . not for her inability to function while at work" (Tr. 17). But letters from Kiamichi Council on Alcoholism and Drug Abuse, the claimant's last employer, make it clear the claimant was unable to work because of medical problems that caused excessive absences; in the January 28, 2003 letter, Executive Director Dorthea Whitten wrote: "It is with great regret that Kiamichi Council must end your employment due to you not being able to be at work because of complications of your illness." (Tr. 771). Claimant apparently returned to work for Kiamichi Council, because Ms. Whitten wrote a second letter dated March 27, 2003 to claimant, again terminating her employment for excessive absences (Tr. 770). Ms. Whitten went on to write: "We at Kiamichi Council view you as a personal and professional friend and wish you the very best for the future as we are all praying for your fast and healthful recovery *from your illnesses*" again making it clear that it was claimant's medical problems that prevented her from being able to attend work on a regular basis (Tr. 770) [emphasis added]. Thus, a great deal of the ALJ's statements regarding claimant's credibility (or lack thereof) is either unsupported or contradicted by the record, which necessitates reversal. *Bakalarski v. Apfel*, 1997 WL 748653, at *3 (10th Cir. Dec. 3, 1997) ("Because a credibility assessment requires consideration of all the factors 'in combination,' when several of the factors *relied upon* by the ALJ are found to be unsupported or contradicted by the record, we are precluded from weighing the remaining factors to determine whether they, in themselves, are sufficient to support the credibility determination.") [citation omitted].

Because the ALJ failed to properly analyze the claimant's credibility, the decision of the Commissioner must be reversed and the case remanded to the ALJ for a proper credibility analysis. If such analysis results in any adjustments to the claimant's RFC, the ALJ should re-determine what work the claimant can perform, if any, and ultimately whether she is disabled.

## Conclusion

In summary, the Court finds that correct legal standards were not applied by the ALJ, and the decision of the Commissioner is therefore not supported by substantial evidence. Accordingly, the decision of the Commissioner is hereby REVERSED and the case is REMANDED for further proceedings consistent herewith.

**DATED** this 30th day of September, 2011.

_____
Steven P. Shreder
United States Magistrate Judge
Eastern District of Oklahoma